UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

KENNETH J. DOOLEY,

                    Plaintiff,

v.

ASPEN TECHNOLOGY, INC.,

                    Defendant.

C. A. No. 1:14-cv-10051-LTS

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS WHICH
PRECLUDE SUMMARY JUDGMENT AND SUPPORTING DOCUMENTS ("PSOF")**

Now comes the Plaintiff, Kenneth J. Dooley ("Ken Dooley"), and hereby offers the

following Plaintiff's Statement of Material Facts which Preclude Summary Judgment, with

references to supporting documents (hereinafter "PSOF"):

1.     Defendant Aspen Technology, Inc. ("Aspen") is a provider of software and support

       services for optimizing process engineering, primarily to chemical companies.  (Dooley

       Aff., ¶2.)

2.     Ken Dooley was hired by Aspen on or about June 16, 2008 as a Product Marketing

       Manager. (Dooley Aff., ¶3.)

3.     From the date of his hire until July 2012, Ken Dooley's job responsibilities at Aspen

       involved traditional product marketing activities including preparing marketing literature

       content, preparing website content, preparing materials for sales use, generating

       marketing plans, preparing competitive analysis and other similar materials.  (Dooley

       Aff., ¶4, Ex. 1.)

4.     From the date of his hire until July 2012, Ken Dooley was the Marketing Manager for all

       of Aspen's HYSYS engineering products.  (Dooley Aff., ¶5.)

5.      HYSYS is a software program used by oil and gas companies to optimize their oil and
        gas production and refining operations.  (Dooley Aff., ¶6.)

6.      HYSYS is one of Aspen's most important engineering products and generates more
        revenue for Aspen than any other Aspen engineering product family.  (Dooley Aff., ¶7.)

7.      HYSYS is used by three categories of oil and gas companies:  (i) upstream companies,
        which are companies that explore and produce oil; (ii) downstream companies, which are
        companies that handle oil and gas refining; and (iii) midstream companies, which are the
        companies that essentially handle the midpoint between upstream and downstream
        companies.  HYSYS is also utilized by engineering and construction companies that
        service oil and gas companies.  (Dooley Aff., ¶8.)

8.      As the Product Marketing Manager of the HYSYS products, Ken Dooley had direct
        responsibility for the marketing efforts for all of the HYSYS products.  (Dooley Aff., ¶9.)

9.      From the date of his hire until July 2012, Ken Dooley reported to Sanjeev Mullick, the
        Director of Engineering Product Marketing, who in turn reported to Greg Howard, a Vice
        President of Marketing who, in turn, reported to Blair Wheeler, Executive Vice President
        of Marketing, who in turn reported to Mark Fusco, the President/CEO of Aspen.  (Dooley
        Aff., ¶10.)

10.     From the date of his hire until July 2012, Ken Dooley consistently received positive
        performance evaluations from Mr. Mullick and was consistently recognized as a reliable
        and valued member of Aspen's marketing team who consistently met expectations.
        Sanjeev Mullick noted in his July 11, 2012 email to Ken Dooley which forwarded Ken
        his 2012 performance evaluation: "I want to thank you for your support over the years in

Marketing. We built an amazing team that did a tremendous amount of good for our customers, the company, and for marketing." (Dooley Aff., ¶11, Ex. 2-6.)

11. During his employment at Aspen, Ken Dooley received salary increases and bonuses every year. When Ken Dooley started in 2008, his yearly salary was $115,000.00 per year. In 2009, his total compensation was $119,312.58. In 2010, his total compensation was $128,800.12. In 2011, his total compensation was $133,566.69. In 2012, the year Ken Dooley was out on disability, his total compensation was $134,096.23. (Dooley Aff., ¶12.)

12. In June 2012, Ken Dooley was diagnosed with Stage IV throat and neck cancer. (Dooley Aff., ¶13.)

13. Ken Dooley informed Darlene Carmolli, Aspen's Benefits Coordinator within the Human Resources Department, that he would need some time off from work to attend to his medical issues. (Dooley Aff. ¶14.)

14. Ken Dooley began his initial cancer treatments, chemotherapy and radiation, in late June or early July 2012. (Dooley Aff., ¶15.)

15. From about July 2, 2012 through on or about July 27, 2012, Ken Dooley continued to work while he received cancer treatments. During this period of time, Ken Dooley used his sick time for any time he missed from work. (Dooley Aff., ¶16.)

16. From July 30, 2012 to October 1, 2012, Aspen granted Ken Dooley's request for a continuous leave of absence from work in connection with his cancer treatment. As of July 30, 2012, Ken Dooley was no longer able to work due to his physical condition and the fact he was receiving medical treatments every weekday. Aspen designated Ken

Dooley's leave of absence as Family and Medical Leave Act ("FMLA") leave and he

continued to be paid pursuant to his short term disability insurance. (Dooley Aff., ¶17.)

17.     Shortly before Ken Dooley went on leave, Sanjeev Mullick, who worked in Houston,

Texas, was removed as Director of Engineering Product Marketing and was transferred to

another position. (Dooley Aff., ¶18.)

18.     Sanjeev Mullick's position was changed, not because of any performance issue, but

because Aspen's management decided to locate the entire engineering product marketing

group in Burlington, Massachusetts and Sanjeev Mullick did not want to relocate there

from Houston, Texas.   (Wheeler Depo., pp 35-36.)

19.     On or about September 17, 2012, Ken Dooley was cleared by his doctor to return to work

on a part-time basis.  Ken Dooley was unable to work full time due to the lasting effects

of the chemotherapy and radiation which made him tired and weak. (Dooley Aff., ¶19.)

20.     After discussions between Ken Dooley, Aspen's human resources department and Blair

Wheeler, it was agreed that Ken Dooley would return to work on a part-time basis

commencing October 1, 2012. (Dooley Aff., ¶20.)

21.     Blair Wheeler informed Ken Dooley at that time that Ken Dooley should speak to Ron

Beck when Ken Dooley returned to work on October 1, 2012, as Blair Wheeler had

appointed Ron Beck to lead the Engineering Product Marketing Department and Ron

Beck would work with Ken Dooley to develop and manage his work schedule. (Dooley

Aff., ¶21.)

22.     After Ron Beck became the Director of Engineering Product Management, his bonus was

based on his ability to increase the sales of engineering products.  (Beck Depo., pp. 30-

32.)

23.    Prior to Ken Dooley's return to work on October 1, 2012, he had conversations with Darlene Carmolli from Aspen's Human Resources Department. Darlene Carmolli told Ken Dooley that he should start working four hours a day and could increase his hours as he felt able to do so and as per doctor's instructions. During these discussions, Ken Dooley was never told that he could only work four hours as day. Darlene Carmolli told Ken Dooley that he should fill out his time sheet listing the hours that he had worked and the balance of hours, to a total of 8 hours, and would continue to be paid by his short term disability coverage. Darlene Carmolli also informed Ken Dooley that the maximum number of hours that he was supposed to work on a part-time basis was thirty-one hours per week. (Dooley Aff., ¶22.)

24.    When Ken Dooley returned to work on October 1, 2012, the Engineering Marketing Department consisted of Ken Dooley, Ron Beck and Julie Levine. During most of Ken Dooley's tenure at Aspen, the department had consisted of Sanjeev Mullick and four product marketing managers. (Dooley Aff., ¶23.)

25.    Even with four marketing managers, the Engineering Product Marketing Department had been woefully understaffed as there was just too much work to be done to adequately support and promote the products out in the marketplace. (Wheeler Depo, pp., 42-44, 59.)

26.    On the first or second day after returning to work, Ken Dooley had a meeting with Ron Beck to go over the work that needed to be completed and the priorities. (Dooley, Aff., ¶24.)

27.   During this initial meeting, Ron Beck informed Ken Dooley that the marketing department was under an October 30, 2012 deadline for the roll out of an updated company website and that they had a lot of work to do. Ron Beck repeatedly stressed the importance of the October 30, 2012 deadline and assigned Ken Dooley numerous web pages for him to develop content. The assigned web pages were not only for HYSYS products but also for Equipment Products which had previously been managed by Steve Noe who had recently retired. Ken Dooley previously had never worked with these Equipment Products. (Dooley Aff., ¶25.)

28.   During Ken Dooley's initial meeting with Ron Beck, they discussed his medical condition and discussed that Ken was returning to work part-time due to the effects of his cancer treatment. During this conversation there was no discussion that Ken Dooley would only be working four hours a day.  (Dooley Aff., ¶26.)

29.   Toward the end of this initial meeting, Ron Beck told Ken Dooley that he was starting with a "clean slate" with Ron Beck. Ken Dooley understood the comment to mean that he had a clean slate now that he had just come back from medical leave. Ken Dooley believed that Ron Beck was negatively commenting on the fact that he had been out on medical leave. Ken Dooley was surprised that Ron Beck made that comment and asked Ron Beck: "What does that mean?" Ron Beck didn't answer Ken Dooley, but instead stared at him and strangely walked away without answering. (Dooley Aff., ¶27.)

30.   Ron Beck's claims that he had observed that Ken Dooley had become less pro-active in his work at Aspen over the years are completely false. Until October 1, 2012, Ken Dooley had never worked for Ron Beck and had almost no interaction with him. While Ken and Ron both reported to Sanjeev Mullick, they did not work together on the same

products and Ron Beck was not responsible for reviewing Ken Dooley's work nor did Ron Beck ever review Ken Dooley's work product prior to October 1, 2012.  Prior to October 1, 2012, Ron Beck simply did not have an opportunity to observe Ken Dooley's work. (Dooley Aff., ¶28.)

31.  Ron Beck's claims that Ken Dooley told him that he had become less proactive in his work or that Ken Dooley ever discussed his work productivity at Aspen with Ron Beck prior to October 1, 2012 are completely false.  Ron Beck and Ken Dooley never discussed Ken Dooley's work productivity at Aspen prior to October 1, 2012.  (Dooley Aff., ¶29.)

32.  On October 11, 2012, only eight work days after Ken Dooley had returned to work on a part-time basis from medical leave, Ron Beck emailed him complaining about the "pace of the progress on the new web pages" he had assigned to Ken Dooley.  Since his return, Ken Dooley had been diligently working on the web pages that had been assigned to him to the extent Ken Dooley was able to do so.  Ken Dooley was aware that Ron Beck was under pressure to make the end of the month deadline and was doing his best to complete the work as quickly as possible given his condition.  The number of web pages that had been assigned to Ken Dooley could not have been completed in the time allotted even if Ken Dooley had been able to work 40 hours per week.  Ron Beck concluded his email stating: "As I said when we first met when you returned from disability leave, as far as Ken Dooley am concerned we are starting with a clean slate, but so far this isn't a great start." (Dooley Aff., ¶30, Ex. 7.)

33.   Ken Dooley continued to work part-time until October 31, 2012, when he took another two full weeks of FMLA leave, which was available to him, to have surgery to remove the remains of the tumor in his neck and the associated lymph nodes. (Dooley Aff., ¶31.)

34.   During October 2012, it was clear that Ron Beck was under pressure to meet the October 30, 2012 date for the roll out of the updated website and it was also clear that Ron Beck was irritated by the quantity of work Ken Dooley was able to complete while only working part-time. (Dooley Aff., ¶32.)

35.   Ken Dooley's absence from work for his medical leave placed additional pressure on Ron Beck in his new job assignment.  (Wheeler Depo., pp 83-84.)

36.   Ron Beck told his boss, Blair Wheeler, that he was under more pressure due to Ken Dooley's absence.  (Wheeler Depo, pp. 83-84.)

37.   Prior to going on his second leave, Ken Dooley had informed Ron Beck that he would be out on leave and that he would be having surgery on November 1, 2012. (Dooley Aff., ¶33.)

38.   On November 2, 2012, while Ken Dooley was in the hospital recovering from surgery to remove the tumor from his neck, Ken Dooley received an email from Ron Beck accusing him of falsifying his time sheet and denigrating the work Ken Dooley had done while working part-time during October 2012.  (Dooley Aff., ¶34, Ex. 8.)

39.   In the November 2, 2012 email, Ron Beck stated:  "I'm returning your time sheet for this week for you to re-submit.  I would like you to resubmit it being 100% honest with yourself as to how many hours of work you contributed during this week."  This was the first time in Ken Dooley's entire professional career that he had been accused of being dishonest and it had a devastating effect on him.  Ron Beck then went on to state that Ken

Dooley could not have worked the number of hours he put on his time sheet because he had not been productive.  Ron Beck's statements were false and personally insulting. (Dooley, Aff. ¶35, Ex. 8.)

40.  Ron Beck concluded his email stating: "I realize you are in recovery mode, but I would recommend that you stay home if you are not feeling able to be 100% productive and that when you do say you are ready to work, that you are ready to work 100% and produce high quality on time work as the company expects from our highly visible group." (Dooley Aff., ¶36, Ex. 8.)

41.  When Ken Dooley received the November 2, 2012 email, despite being heavily medicated with pain killers and recovering from major surgery the day before, he was shocked and worried.  Ken Dooley had never received an email like this and, despite the factual inaccuracy of the allegations contained in the email, Ken Dooley was immediately afraid that he was going to be fired.  Ken Dooley almost immediately responded to the email indicating that he would change his time sheet and explained that he had worked the extra hours because he knew he was going to be out for his surgery.  Ken Dooley stated in his response: "I appreciate your desire that I return only when at 100%, I will try to accelerate my recovery if possible, but also have to work with the HR disability guidelines."  (Dooley Aff., ¶37.)

42.  On November 4, 2012, out of concern that he was going to be fired if he did not comply with Ron Beck's requests, Ken Dooley changed his time card within one hour of being released from the hospital and emailed Ron Beck to notify him that he had done so. (Dooley Aff., ¶38, Ex. 10.)

43.    Unbeknownst to Ken Dooley, Ron Beck had previously complained to Blair Wheeler and
Bob Dorion about having to monitor Ken Dooley's hours while he worked part-time.  On
October 23, 2012, in response to a request to approve Ken Dooley's time sheet, Ron Beck
emailed Wheeler and Dorion stating: "I am not happy with what he submitted.  I feel he
is pushing the system.  It's very difficult to monitor this part-time situation, unless I
wanted to check when he arrives and leaves, which I don't really want to do, but I'm
approving it now." (LeClair Aff., Ex. E & F.)

44.    On November 6, 2012, after Ken Dooley had only five days to recover from his surgery
and get off the pain medicine, Ken Dooley sent Ron Beck an email responding to the
allegations he made in his November 2, 2012 email to Ken.  In his response, Ken Dooley
pointed out that not only had he worked more than four hours a day but also that Ron
Beck was clearly aware that Ken was working more than four hours a day as Ron had
asked Ken to attend a meeting at 1:00 p.m. which lasted until 2:00 p.m.  Additionally,
Ken Dooley pointed out that the whole company was released from work on Monday,
October 29, 2012 at noon due to Hurricane Sandy and given credit the whole day.  Ken
Dooley had actually worked until from 8:00 a.m. until 1:30 p.m. on that day.  Despite the
fact that everyone else was released at noon and given credit for the whole day, Ron Beck
only wanted Ken Dooley to charge four hours of regular time.  It is important to note that
it did not make a significant financial difference to Ken Dooley whether he charged his
time as straight time or disability time as he was receiving short term disability payments.
The only real difference was that by only billing four hours a day as straight time, Ken
Dooley was using up more of his FMLA leave time.  Based on Ron Beck's insistence that
Ken Dooley use his disability time, it is clear that he resented the fact that Ken Dooley

had been out on disability and initially returned to work on a part-time basis.  Despite

Ron Beck's assertion, Ken Dooley had been instructed by the Human Resources

department that part-time was anything up to 31 hours per week.  (Dooley Aff., ¶39, Ex.

11.)

45.     In his November 6, 2012 response, Ken Dooley also pointed out that there had been no

agreed upon timelines for the work he was doing nor had he been informed of any set

deadline for the completion of the work.  Ken Dooley stated that he would continue to

work to the best of his abilities to complete the work Ron Beck was assigning him.  Ken

Dooley pointed out that the content of the work Ron was complaining about was

completed by Steve Noe and that Steve Noe's content certainly would "say something

useful".  Steve Noe had managed that product line for its entire life at Aspen.  Ken

Dooley and Ron Beck had previously discussed that Ken was going to use Steve Noe's

content and simply reformat it as Ken Dooley did not have experience with the subject

matter as it related to products outside the HYSYS family.  Ken Dooley also informed

Ron Beck that "I do not know when I will be back to 100% productivity; but I will not be

staying home once I am medically cleared to work."  Ron Beck was clearly pressuring

Ken Dooley not to exercise his rights under the law to return to work on a part-time basis.

(Dooley Aff., ¶40, Ex. 11.)

46.     On November 6, 2012, Ken Dooley forwarded a copy of Ron Beck's November 2, 2012

email along with Ken's November 6, 2012 response to Blair Wheeler, Executive Vice

President of Marketing.  Ken Dooley pointed out in his email to Blair Wheeler that "I

understand why Ron would want me to be at 100% productivity; I am working to get to

that point as quickly as possible, but his demand that I stay home until I reach that point

is not reasonable and may not even be legal…" Blair Wheeler forwarded the email to Robert "Bob" Dorion, Aspen's Senior Director, Human Resources, who asked Ken Dooley to meet with him when he returned to the office. (Dooley Aff., ¶41, Ex. 12.)

47.   Ken Dooley returned to work on a full time basis on November 12, 2012.  On that same day, Ken Dooley met with Bob Dorion to review and discuss Ron Beck's November 2, 2012 email.  After discussing the matter, Bob Dorion told Ken Dooley that he would correct Ken's timesheet for the week in question and approve it as Ken had originally submitted it. (Dooley Aff., ¶42.)

48.   Notably, Bob Dorion thought the November 2, 2012 email from Beck to Dooley was inappropriate. (Dorian Depo., pp. 43-44.)

49.   After Ken Dooley returned to work on November 12, 2012, he immediately observed that Ron Beck's demeanor towards him had gone from bad to worse.  Ron Beck never made any effort to explain or apologize for his November 2, 2012 email but instead simply informed Ken Dooley that he would be giving him specific items to complete each week and demanded that Ken Dooley provide him with weekly status reports on the work that Ken had completed. (Dooley Aff., ¶43.)

50.   Frequently, the "to do list" Ron Beck gave Ken Dooley each week was so extensive that it was impossible to complete in one week.  When Ken Dooley would deliver his work product or status reports to Ron Beck, Ron Beck would be unreasonably hyper-critical of the work and/or complain that Ken Dooley had not completed the quantity of work that Ron Beck was unreasonably expecting.  (Dooley Aff., ¶44.)

51.   Prior to October 1, 2012, Ken Dooley's work quality and quantity had never been subjected to the type of gratuitous criticism it was receiving from Ron Beck.  By the end

of November 2012, Ken Dooley was producing the same quality and quantity of work that he had produced prior to his disability. As of November 12, 2012, it was clear that Ron Beck did not want Ken Dooley working in his department and that he was going to try to make Ken Dooley's work environment so intolerable that would he would leave. Ron Beck was retaliating against Ken Dooley for taking his FMLA leave and returning to work on a part-time basis in October 2012 and for complaining to Blair Wheeler about Ron Beck's November 2, 2012 email to Ken Dooley while he was in the hospital. (Dooley Aff., ¶45.)

52.    Ron Beck's December 9, 2012, January 4, 2013 and March 4, 2013 emails to Ken Dooley are examples of Ron Beck's subjective and undeserved criticisms of Ken Dooley's work and unreasonable demands. (Dooley Aff., ¶46.)

53.    During the end of December 2012, Ken Dooley discovered that Aspen had published a job posting for Ken Dooley's position on the company website on November 13, 2012, one day after Ken Dooley had returned from medical leave.  The job posting was for "an outstanding product marketing manager to lead global product marketing efforts for the flagship Aspen HYSYS product family.  This position has primary 'go to market' responsibility for packaging, positioning, messaging and the commercial success of Aspen HYSYS and related products."  The posting further provided the job responsibilities were to "[l]ead go-to-market efforts for the overall HYSYS product family, including direct ownership of the downstream products…" (Dooley Aff., ¶47, Ex. 13.)

54.     Ron Beck was responsible for drafting the November 13, 2012 job posting, including

defining the role and the responsibilities of the position contained in the job posting.

(Dorian Depo., pp. 84-85; Wheeler Depo., pp. 67, 69-70.)

55.     Ron Beck prepared the first draft of the November 13, 2012 job posting during the first

week of November, while Ken Dooley was out on FMLA leave having his cancer

operation.  (Beck Depo., pp. 99-100, Ex. 2.)

56.     The position advertised in the November 13, 2012 job posting was for the same position

Ken Dooley had held since June 2008.  Ken Dooley was never notified that Aspen was

advertising his job position and only discovered the job posting after Ken Dooley was

tipped off by a friend who saw the add on the company website. (Dooley Aff., ¶48.)

57.     On January 17, 2013, Ken Dooley emailed Bob Dorion and Blair Wheeler requesting a

meeting to discuss the fact that the company was advertising his position.  Shortly after

his request, a meeting was scheduled between Ken Dooley, Bob Dorion and Blair

Wheeler for January 23, 2014 to discuss Ken Dooley's concerns.  (Dooley Aff., ¶49, Ex.

14 .)

58.     On January 21, 2013, Ken Dooley received an email from Ron Beck forwarding Ken

Dooley an organizational chart for the Engineering Product Marketing Department dated

October 2012.  According to the October 2012 organizational chart, Ken Dooley had

been demoted to handling the HYSYS Upstream Products, which was a small portion of

the HYSYS family of products.  According to the October 2012 organizational chart,

there was a position for the HYSYS downstream products, as well as a HYSYS lead

position which ostensibly was the position that was advertised in the November 13, 2012

job posting. (Dooley Aff., ¶50, Ex. 15.)

59.    Ron Beck was responsible for preparing the October organizational chart.  (Beck Depo., pp. 55-56, Ex. #3.)

60.    Immediately after reviewing, the organizational chart, Ken Dooley emailed Ron Beck to inquire "why did it take three months to inform me of my demotion?"  Ron Beck responded by email stating "Ken, we looked at this org chart as a group in a meeting months ago."  This statement was completely false; Ken Dooley had not seen the October 2012 organizational chart until January 21, 2013.  Notably, Ron Beck did not deny or rebut Ken Dooley's statement that he had in fact been demoted three months earlier. (Dooley Aff., ¶51, Ex. 16.)

61.    On January 23, 2013, Ken Dooley met with Blair Wheeler and Bob Dorion and told them that he believed the that he was being forced out of the company by Ron Beck because of his illness and absences from work.  Ken Dooley told Blair Wheeler and Bob Dorion that it was clear that Ron Beck was trying to get rid of him in light of the October 2012 organizational chart, the November 13, 2012 job posting, Ron Beck's November 2, 2012 email and his continuous unreasonable and undeserved criticism of Ken Dooley's work quality and quantity.  (Dooley Aff., ¶52.)

62.    Blair Wheeler told Ken Dooley that the Product Marketing Manager job posted on November 13, 2012 was a mistake and that he was not being replaced.  Ken Dooley told Blair Wheeler and Bob Dorion that it was clear that Ron Beck was trying to force him out and that he should not have to suffer Ron Beck's abuse.  Ken Dooley requested to be reassigned to another position in the Marketing Department or, if their plan was in fact to fire him, Ken Dooley wanted severance pay because what Ron Beck was doing to him violated his legal rights.  Ken Dooley also told Blair Wheeler and Bob Dorion that he was

concerned that Ron Beck's harassment was affecting his health and his recovery from cancer. (Dooley, Aff. ¶53.)

63.     Without giving any consideration to the matter, Blair Wheeler told Ken Dooley that he would not reassign him and if.that he did not like working for Ron Beck he could quit. Ken Dooley never quit his job nor did he ever resign his position. (Dooley Aff., ¶54.)

64.     On January 25, 2013, two days after Ken Dooley's meeting with Blair Wheeler and Bob Dorion, Ron Beck emailed Ken Dooley a revised organizational chart, dated January 25, 2013. The January 25, 2013 organizational chart no longer had a lead marketing position for the HYSYS products but still had Ken Dooley responsible only for the HYSYS upstream products, which was a very small portion the HYSYS products. According to the organizational charts, as of October, 2012, Ken Dooley was no longer the Marketing Manager for the HYSYS products but was only responsible for a small portion of the HYSYS products. This change in job position was a major reduction in Ken Dooley's responsibilities and was clearly a job demotion. (Dooley Aff., ¶55, Ex. 17.)

65.     On March 14, 2013, Ken Dooley was called to a meeting with Ron Beck and Bob Dorion and was informed that he was being placed on a 60-day Performance Improvement Plan ("PIP"). The PIP purports to list Ken Dooley's alleged work deficiencies and then sets a number of goals that Ken Dooley must reach by delineated deadlines. The PIP concludes with the admonition that if the goals are not attained by their deadlines, Ken Dooley will be subjected to further employment action, including termination. (Dooley Aff., ¶56, Ex. 18.)

66.     It was Ron Beck's idea to place Ken Dooley on a PIP. (Wheeler Depo., p. 132.)

67.    Ron Beck started drafting Ken Dooley's PIP on January 2, 2013. (Beck Depo., pp. 165-166., Ex 8.)

68.    The first claimed deficiency in the PIP was Ken Dooley's failure to deliver a technical "White Paper" on Aspen HYSYS Hydraulics. This claimed deficiency is completely without merit. During his tenure at Aspen, Ken Dooley had previously drafted two other technical "White Papers" that received positive reviews and were published by the company. In order to draft a technical "White Paper", it is necessary to have technical input from domain experts in the product management department. Ken Dooley had repeatedly requested the input and assistance from the product management group. Despite his repeated requests, Ken Dooley did not receive the necessary input from product management and was told that they had other projects to work on. Ken Dooley had informed Ron Beck a number of times that product management was not supplying the necessary input to complete the paper. Ken Dooley specifically addressed this issue with Blair Wheeler during their January 23, 2013 meeting and Blair Wheeler promised Ken Dooley that he would make sure that product management provided Ken Dooley with the necessary input to complete the "White Paper". Despite Blair Wheeler's assurance, Ken Dooley never received the required support from the product management group and the "White Paper" was delayed. (Dooley Aff., ¶57, Ex. 18.)

69.    In regards to the next two claimed deficiencies, the alleged deadlines set by Ron Beck were not agreed to by Ken Dooley and were unreasonable in light of the other items Ken Dooley was working on at the time. Ron Beck set these deadlines, knowing that Ken Dooley could not meet them, in order establish a pre-text to terminate Ken Dooley. The remainder of the claimed defects in these deliverables were mostly subjective and

unreasonably critical.  The work product that Ken Dooley had delivered to Ron Beck relative to these claimed deficiencies was of the same or better quality than the work Ken Dooley had done prior to his medical leave, which work had been accepted by Ken Dooley's supervisor with positive reviews.  (Dooley Aff., ¶58, Ex.18.)

70.  The fourth claimed deficiency in the PIP that Ken Dooley failed to work on getting speakers for the Optimize 2013 conference is completely without merit.  Ken Dooley diligently worked on obtaining speakers for the Optimize 2013 conference and Ron Beck rejected the proposed speaker Ken Dooley had arranged without offering a valid reason for the rejection. (Dooley Aff., ¶59, Ex. 18.)

71.  The PIP sets forth seven items Ken Dooley was required to complete by various milestones.  There was no possible way Ken Dooley could have completed any of the required items by the deadlines set forth in the PIP, even if Ken Dooley had worked 100 hours per week.  Ron Beck set the deadlines in the PIP knowing that Ken Dooley would not be able to meet them in order to have grounds to terminate Ken Dooley's employment on or before May 9, 2013.  (Dooley Aff., ¶60, Ex. 18.)

72.  The first required deliverable was the completion of the "White Paper" by March 22, 2013.  Ron Beck was aware that Ken Dooley would not be able to complete the "White Paper" because Ken still had not received the necessary input from the product management group despite Ken's repeated requests and the promise he had received from Blair Wheeler that he would receive the input. (Dooley Aff., ¶ 61, Ex. 18.)

73.  The second required deliverable was to "demonstrate [my] ability to effectively demonstrate HYSYS V8" by March 22, 2013.  Prior to his FMLA leave, Ken Dooley had never been asked to demonstrate any HYSYS software, as Aspen had sales support

personnel who handled the demonstrations of the software. Ken Dooley had never received training in the software and was never offered any training. After Ken Dooley received the PIP, he inquired of the product management group how long it would take to be trained in the software. Ken Dooley was told by a product management person that it would take over a month to be trained to demonstrate the software. Once again, Ron Beck was aware that it would be impossible for Ken Dooley to be trained in the software in order to be able to demonstrate the software by the deadline Ron Beck had set in the PIP. (Dooley Aff., ¶62, Ex 18.)

74.    The remaining five deliverables in the PIP were all within Ken Dooley's skill set and were the type of materials Ken Dooley was required to produce and which he did produce to the satisfaction of his supervisor prior to his FMLA leave. The quantity of work involved in deliverables 3 through 7 was impossible to complete within the deadlines set forth in the PIP and Ron Beck was aware of that fact. (Dooley Aff., ¶63.)

75.    The PIP clearly states that Ken Dooley's failure to complete the seven deliverables by their respective deadlines would lead "to further corrective action up to and including termination of employment with Aspen Technology". (Dooley Aff., ¶64, Ex. 18.)

76.    The PIP concludes: "Ken, I have offered guidance to help position you for success, but it is ultimately up to you to consistently perform." This statement is completely false. Almost immediately after Ken Dooley returned to work part-time from FMLA leave, Ron Beck was insulting, condescending and hostile towards him. Ron Beck asked Ken Dooley to complete work by setting unreasonable deadlines and then was unreasonably hypercritical of the work Ken Dooley delivered. (Dooley Aff., ¶65, Ex. 18.)

77.     Ron Beck resented the fact that Ken Dooley had gone out on FMLA leave and had exercised his right to return work on a part-time basis and as a result Ron Beck wanted to terminate Ken Dooley. The PIP was the formalization of Ron Beck's intent to terminate Ken Dooley's employment and Ken Dooley told Ron Beck and Bob Dorion that the PIP was completely pre-textual and that he understood they would terminate him on or before May 9, 2013. Bob Dorion tried to tell Ken Dooley that his termination was not a foregone conclusion and that Ken Dooley could complete the PIP and continue working for Aspen. Ken Dooley told Bob Dorion that it was simply impossible for him to successfully complete the PIP as the deadlines were impossible to meet. Ken Dooley asked Bob Dorion to give him an example of one person who had successfully completed a PIP at Aspen. Bob Dorion could not recall a single instance where someone had successfully completed a PIP at Aspen. (Dooley Aff., ¶66.)

78.     During his tenure at Aspen, Blair Wheeler was involved with placing five employees on PIP's. During his deposition, Blair Wheeler was unable to recall the name of one person who completed a PIP and continued to work with Aspen. (Wheeler Depo., pp. 114-115)

79.     During the afternoon of March 15, 2013, Ken Dooley met with Bob Dorion to discuss the PIP. During this meeting, Ken Dooley once again expressed his view that he was being terminated because of his illness and that the PIP was just a formal step prior to termination. During this meeting, Bob Dorion suggested that in cases such as Ken Dooley's the company may be willing to pay him severance as a result of his termination but that Bob Dorion would have to discuss it with senior management. (Dooley Aff., ¶67.)

80.   Following his meeting with Bob Dorion, Ken Dooley forwarded him an email providing his feedback to the PIP. (Dooley Aff., ¶68, Ex. 19.)

81.   Ron Beck's true intention to terminate Ken Dooley's employment is revealed in an email he sent Ken Dooley on March 22,.2015 in which he points out that Ken Dooley had already failed to meet the first delivery deadline of March 20, 2013. Ron Beck stated that he wanted Ken Dooley to continue to update him on the progress of the deliverables on the PIP plan despite the fact that Ron Beck was going to be on vacation. Ken Dooley responded to his email and once again reiterated that the PIP was nothing more "than the formalization of my exit from the company". Ken Dooley also assured Ron Beck that he would "continue to act professionally and contribute as much as I can with a focus on the highest priorities…" After he received the PIP, Ken Dooley continued to diligently work in a professional manner on the deliverables requested of him, despite the fact that he disagreed with the PIP. (Dooley Aff., ¶69, Ex. 20.)

82.   On March 22, 2013, Ken Dooley met with Bob Dorian again to discuss the PIP and his position at Aspen and what were the likely options that could play out. During this conversation, Ken Dooley once again made it clear that he felt that he was being wrongfully terminated. Bob Dorion stated that he was working with senior management to obtain authorization to make Ken Dooley an offer of severance pay in connection with his termination. (Dooley Aff., ¶70.)

83.   Following their March 22, 2013 meeting, Bob Dorian and Ken Dooley communicated regularly. During one of these conversations, Bob Dorian suggested that Ken Dooley's termination date be set at April 5, 2013 as it would insure that Ken would continue to receive certain insurance benefits. Ken Dooley agreed to the April 5, 2013 date because

it was clear from his discussions with Bob Dorion that his employment was in fact going to be terminated on or before May 9, 2013. (Dooley Aff., ¶71.)

84.    At no time did Ken Dooley request to be terminated by Aspen and at no time did Ken Dooley indicate that he was agreeing to resign from Aspen.  (Dooley Aff., ¶72.)

85.    On April 3, 2013, Bob Dorian emailed Doris Mohs, an Aspen Sr. HR Coordinator stating in relevant part: "Ken Dooley's last day of employment will be this Friday, April 5th. Please prepare the standard separation agreement for him with ten (10) weeks of severance pay in exchange for a release.  He is over 40.  Also, please have payroll prepare his final pay checks, paying him for working through Friday, April 5th, and any accrued unused vacation time, and two (2) weeks of pay in lieu of notice.  This is an involuntary termination and he will be eligible for unemployment compensation." (LeClair Aff., Ex. "D".)

86.    On April 5, 2013, Aspen terminated Ken Dooley's employment.  At the same time, Aspen made Ken Dooley an offer of severance pay in connection with his termination. (Dooley Aff., ¶73, Ex. 21-22.)

87.    Aspen's offer of severance pay was conditioned upon Ken Dooley releasing all his claims against Aspen, including his claims under FMLA and ADEA.  Ken Dooley did not accept the offer of severance pay. (Dooley Aff., ¶75.)

88.    Aspen's internal records clearly indicate that Dooley's termination as involuntary. (Dorian Depo., pp. 95-96, Depo., Ex. 11.)

89.    Furthermore, Aspen Tech reported to the Massachusetts Division of Unemployment Insurance that Ken Dooley's termination was involuntary.  (Dorian Depo., pp. 98-100.)

90.    Despite Aspen's position in its motion for summary judgment, Bob Dorion testified in his

deposition that Ken Dooley did not resign his position.  (Dorian Depo., p. 136.)

91.    Bob Dorion also testified in his deposition that whether or not Dooley accepted the

severance offer, Ken Dooley's employment was going to be terminated on April 5, 2013.

(Dorian Depo., pp. 131, 137.)

Respectfully submitted,
Kenneth J. Dooley,
By his Attorney,

_____
L. Richard LeClair, III
BBO# 561650
LeClair & LeClair, P.C.
707 Main Street
Waltham, MA 02451
(781) 893-5655
(781) 647-9346 (Fax)
LRL@LECLAIRLAW.COM

Date:   March 13, 2015

## CERTIFICATE OF SERVICE

This is to certify that on March 13, 2015, this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

_____
L. Richard LeClair, III, Esq.